

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
      Plaintiff, )      No. 06 C 6056
)
      v. )
)      Judge Ronald A. Guzmán
MICHAEL J. and CYNTHIA T. )
FLETCHER, )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

The government has sued defendants to recover more than $389,000.000 in taxes it claims

to have mistakenly refunded to them. The parties have each filed a motion pursuant to Federal Rule

of Civil Procedure 56 for summary judgment. For the reasons set forth below, the Court grants the

government's motion and denies defendants' motion.

## Facts[1]

From 1995 until 2000, Cynthia Fletcher was an accredited consulting partner ("ACP") with

Ernst & Young. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5-6.) On May 23, 2000, Ernst & Young entered into

a transaction with Cap Gemini, S.A., in which: (1) Ernst & Young contributed its consulting

business to a newly-formed Delaware limited liability company called CGE&Y, and some of its

interest in CGE&Y to its ACPs; and (2) Ernst & Young and its ACPs transferred all of their interest

in CGE&Y to Cap Gemini. (*Id.* ¶¶ 3-4.)

---

[1]Unless noted otherwise, the following facts are undisputed.

On March 2, 2000, Ernst & Young gave its ACPs a partner information document ("PID"), setting forth the details of the transaction. (*Id.* ¶ 11.) Several exhibits were attached to the PID, but the actual transaction documents were not. (*Id.* ¶ 16.)

Among other things, the PID said that: (1) "[a]ll partners will vest in their shares immediately upon closing;" (2) the sale to Cap Gemini "should be a capital gain transaction, taxable at capital gain rates, with a minimal amount of ordinary income;" (3) stock received by ACPs would be valued at "95 percent of the closing price of Cap Gemini stock" on the closing date; and (4) "[t]he gain on the sale . . . is reportable on Schedule D of [the ACPs'] U.S. federal income tax return[s] for 2000." (Defs. Ex. 1D, PID at 000710, 000721, 000726-27.) However, it also said that:

> The contents of this document are not to be construed as legal, business or tax advice. You should consult your own attorney, business advisor, and tax advisor as to legal, business, and tax matters. In making a decision, you must rely on your own examination of Cap Gemini and the terms of the transaction, including the merits and risks involved.

(*Id.* at 000740.) The PID also advised the ACPs that a meeting would be held on March 7 and 8, 2000 to discuss the transaction. (*Id.* at 000709.)

The same day it issued the PID, Ernst & Young also made the master transaction agreement available to the ACPs. (Defs.' LR 56.1(a)(3) Stmt. ¶ 17.) However, the agreement was available only online, could be read only on the ACPs' office computers and could not be printed, copied, downloaded or forwarded. (*Id.*) The master transaction agreement was 580 pages long and cross-referenced several ancillary agreements, making the transaction documents, in total, more than 700 pages long. (*Id.* ¶¶ 18-19.)

Cynthia and the other ACPs who attended the meeting on March 7 and 8 were asked to vote for or against participating in the transaction immediately after the meeting. (*Id.* ¶ 14; Pl.'s LR 56.1(a)(3) Stmt. ¶ 30.) Any ACP who did not attend the meeting was required to submit his or her

2

ballot electronically by March 13, 2000. (Defs.' LR 56.1(a)(3) Stmt. ¶ 15.) Nearly ninety-five percent of Ernst & Young's ACPs, including Cynthia, voted in favor of the transaction. (Pl.'s LR 56.1(a)(3) ¶¶ 34, 37.)[2]

Cynthia says that her access to the transaction documents was so limited that she had no "real opportunity" to read or understand them. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 23-24.) Nonetheless, she says, she voted to participate in the transaction because she thought she would be fired if she did not. (*Id.* ¶¶ 27-28.)

On April 7, 2000, Ernst & Young gave Cynthia a "Partner Transaction Kit" that included some, but not all, of the transaction documents. (*See* Defs.' Ex. 1B, Partner Transaction Kit.) Among other things, the kit instructed the ACPs to review the master transaction agreement, read the consulting partner transaction agreement, review and sign the consulting partner transaction agreement signature document and complete the brokerage account documents. (*Id.* at 000587-88.) The kit also told the ACPs to return the completed documents to Ernst & Young on or before May 1, 2000, which Cynthia did. (*Id.* at 000588; Defs.' LR 56.1(a)(3) Stmt. ¶ 35.)

Among other things, by signing the consulting partner transaction agreement ("CPTA"), Cynthia acknowledged that she: (1) had read the PID and transaction documents and was not relying on any information not contained in them; (2) understood that her receipt of Cap Gemini shares as a result of the transaction "will be a taxable transaction for U.S. federal income tax purposes;" and (3) was obligated to treat and report the transaction as provided in sections 7.7(f) and (h) of the master transaction agreement. (Defs.' Ex. 1B, CPTA at 000622, 000624; *see* Defs.' Ex. 1A, Master Transaction Agreement, § 7.7 (f), (h) at 000121-24.)

---

[2]Defendants responded "[d]enied" to paragraph 37, but their "denial" does not actually controvert the facts the government asserts in that paragraph.

3

After the transaction closed, Ernst & Young gave Cynthia her interest in CGE&Y. (Defs.' 56.1(a)(3) Stmt. ¶ 37.) Subsequently, her interest in CGE&Y was transferred to Cap Gemini and, in return, Cap Gemini allocated 16,500 shares of its stock to a Merrill Lynch restricted account in Cynthia's name. (*Id.* ¶¶ 38, 40.)

By participating in the transaction, Cynthia gave an irrevocable power of attorney to Cap Gemini, effective May 1, 2000, vesting it with exclusive authority over her restricted account for four years and 300 days after the transaction closed. (*Id.* ¶ 45; Defs.' Ex. 1B, CPTA at 000627, 000641.) During that period, the shares in the restricted account could be released only at Cap Gemini's direction, and Cynthia: (1) could not sell, assign, transfer them or otherwise dispose of any interest in them, except in certain "[p]ermitted [d]ivestitures;" (2) had no present right to dividends from the stock; and (3) could make no investment decisions with respect to the account. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 50, 53; Defs.' Ex. 1B, CPTA at 000627-28.)

The transaction documents called for the stock in Cynthia's restricted account to be released in several installments between 2000 and 2005. (Defs.' LR 56.1(a)(3) Stmt. ¶ 53.) However, the documents stated that Cynthia would forfeit some or all of the stock if she: (1) breached the non-competition, non-poaching or secrecy provisions of the transaction documents; (2) voluntarily terminated her employment with Cap Gemini; or (3) was terminated by Cap Gemini "for cause." (*Id.* ¶ 54.) Moreover, if Cap Gemini terminated her for "poor performance," Cynthia would forfeit her right to half of the stock, and the other half of it would be released to her only if a Cap Gemini review committee, whose decisions were non-reviewable, deemed it appropriate to do so. (*Id.*)

According to the PID, twenty-five percent of the stock allocated to Cynthia would be sold immediately after the transaction closed so she would have money to cover the tax obligations the

4

deal would create for her. (Defs.' Ex. 1D, PID at 000719.) Consistent with the PID, Cap Gemini deposited 12,375 shares, seventy-five percent of the amount allocated to Cynthia, into her restricted account shortly after the deal closed. (Defs.' LR 56.1(a)(3) ¶ 41.) Moreover, sometime in June 2000, a deposit of $653,756.00 was made to Cynthia's restricted account, money that the government says resulted from the sale of the other twenty-five percent of Cynthia's shares. (*Id.* ¶ 42; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 7-8.)

In August and December 2001 Cynthia, with Cap Gemini's authorization, sold some of her shares. (*See* Defs.' Ex. 1C at 000698-704, Consulting Participant Notices of 4/25/01 and 8/7/01; Cole Decl., Ex. 17, Documentation of August 2001 Sale; *id.*, Ex. 20, Documentation of December 2001 Sale.)

In May 2003, Cynthia terminated her employment with Cap Gemini. (Defs.' LR 56.1(a)(3) Stmt. ¶ 56.) Ultimately, Cap Gemini gave her six months' termination pay and the remaining stock in the restricted account, the last of which was released in 2004 in accordance with the schedule in the transaction documents. (*Id.*; *see* Cole Decl., Ex. 28, 2003 Monetization Stmt. at 000776; *id.*, Ex. 36, 2004 Monetization Stmt. at 000777.)

At all times relevant to this suit, defendants used the cash receipts and disbursements method of accounting for federal income tax reporting purposes. (Defs.' LR 56.1(a)(3) Stmt. ¶ 57.)

On February 26, 2001, Cap Gemini sent Cynthia a Form 1099-B indicating that she received $2,478,655.00 in gross proceeds from the sale of her interest in CGE&Y on May 23, 2000 and a Form 8308 showing that she had transferred her partnership interest in CGE&Y to Cap Gemini on the same day. (*See* Cole Decl., Ex. 12 at 001204, 001207.)

5

On March 28, 2001, Ernst & Young sent Cynthia a form it said she should attach to her federal tax return for the year 2000, which said "[t]he selling price of the Partnership Interest was $2,478,655 comprised of common stock of Cap Gemini, S.A." and of that amount "$90,585.00 was attributable to Sec. 751 property." (Defs.' LR 56.1(a)(3) Stmt. ¶ 59.) Defendants prepared their federal tax return for 2000 in accordance with those instructions. (*Id.* ¶ 60.)

On August 17, 2001, defendants filed their 2000 federal income tax return. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 66.) They reported a total adjusted gross income of $3,733,180.00 and a tax liability of $972,121.00. (*Id.* ¶¶ 70-71.) On Schedule D of that return, defendants reported $2,478,655.00 in gross sale proceeds from the 2000 transaction. (*Id.* ¶ 67.)

On November 20, 2003, defendants filed an amended tax return for the year 2000. (*Id.* ¶ 72.) The amended return reported that Cynthia had received as income in 2000 only twenty-five percent of the 16,500 Cap Gemini shares allocated to her. (*Id.* ¶ 73.) As a result, the capital gain income they reported was reduced by $1,824,899.00 and they claimed a refund of $386,659.00. (*Id.* ¶¶ 74-75; Defs.' LR 56.1(a)(3) Stmt. ¶ 63.)

On November 8, 2004, the IRS made an abatement of defendants' tax liability for 2000 in the amount of $386,659.00. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 76.) The same day, the IRS refunded $96,663.26 to defendants by applying $50,002.36 to their tax liability for the year 2001 and $46,660.90 to their tax liability for the year 2002. (*Id.* ¶¶ 79-80.)[3] On November 12, 2004, the IRS sent defendants a check for $355,868.71 − $292,511.99 in tax and $63,356.72 in interest. (Cole

---

[3]Defendants deny the facts asserted in these paragraphs but, because they have cited no evidence to support those denials, defendants are deemed to have admitted them. *See* Local Rule 56.1.

Decl., Ex. 30, 11/12/04 Check.) The government says it wrongly refunded that money to defendants and asks the Court to order its return.

## Discussion

To prevail on a summary judgment motion, "the pleadings, the discovery and disclosure materials on file, and any affidavits [must] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the nonmoving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is only appropriate when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.* Morever, "[o]n cross-motions for summary judgment, each movant must . . . satisfy the requirements of Rule 56." *Billings v. Cont. Cas. Co.*, No. 02 C 3200, 2003 WL 145420, at *5 (N.D. Ill. Jan. 21, 2003).

The government is authorized by statute to file a civil suit to recover "[a]ny portion of a tax imposed by this title which has been erroneously refunded." 26 U.S.C. § 7405(b). "In an action to recover an erroneous [tax] refund . . . , the government bears the burden of proof." *United States v. Commercial Nat'l Bank of Peoria*, 874 F.2d 1165, 1169 (7th Cir. 1989).

The government says the refund it made to defendants was erroneous because it was based on the assumption that Cynthia received income in 2000 from only twenty-five percent of the Cap Gemini stock allocated to her. That assumption is wrong, the government says, because the transaction documents clearly contemplate that Cynthia and the other ACPs would receive income

7

from all of the stock when the transaction closed. Defendants, on the other hand, argue that: (1) the parties to the transaction did not intend that the ACPs would receive income from all of the stock at closing; and (2) even if they did, the Court could not enforce that provision because it violates federal tax law.

The Tax Code requires taxpayers like defendants, who use the cash receipts and disbursements method of accounting (*see* Defs.' LR 56.1(a)(3) Stmt. ¶ 57), to report income in the tax year that they actually or constructively receive it. 26 U.S.C. § 451(a) ("The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer . . . ."); 26 C.F.R. § 1.451-1(a) ("Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer . . . ."). A taxpayer constructively receives income when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." 26 C.F.R. § 1.451-2(a). If the taxpayer's control of her receipt of the income "is subject to substantial limitations or restrictions," however, there is no constructive receipt. *Id.* With these principles in mind, the Court turns to the transaction documents.

To ascertain the parties' intent with respect to when the ACPs would receive income from the Cap Gemini stock, the Court must first determine whether the agreements are ambiguous on that point. *See Geothermal Energy Corp. v. Caithness Corp.*, 825 N.Y.S.2d 485, 489 (N.Y. App. Div. 2006).[4] The Court does so "by looking within the four corners of the document." *Id.* (quotation

---

[4]Both the master transaction agreement and the CPTA state that they are governed by the substantive law of the State of New York. (*See* Defs.' Ex. 1A, Master Transaction Agreement at 000181; Defs.' Ex. 1B, CPTA at 000635.)

8

omitted). A contract is ambiguous only if the relevant provisions "are reasonably or fairly susceptible of different interpretations." *Id.* (quotation omitted). The Court may consider extrinsic evidence to determine the parties' intent, only if a contract term is ambiguous. *Id.*

There is no dispute that Cynthia signed the CPTA, or that doing so made her a party to the master transaction agreement. (Defs.' Ex. 1B, CPTA at 000619-20.) Moreover, there are provisions in each agreement that suggest the parties intended the ACPs to receive all of the stock as income when the deal closed. For example, the CPTA says that the ACPs will receive their allotted Cap Gemini shares "[a]t the Closing" and their receipt of those shares would "be a taxable transaction for U.S. federal income tax purposes." (*Id.* at 000620, 000626). Similarly, the master transaction agreement says that: (1) "[a]t the closing," Cap Gemini will deliver the shares allotted to each ACP to the restricted account established on his or her behalf and "provide . . . to . . . each [ACP] a Form 1099-B" with respect to the transaction; (2) the ACPs will file with their tax returns "for the year in which the Closing occurs," the statement required by Treasury Regulation § 1.751-1(a)(3)[5] with respect to the transfer of their interests to Cap Gemini; (3) all parties agree that for federal tax purposes, "the transactions undertaken pursuant to [the agreement] will be treated and reported by them as . . . a sale" of the ACPs' interests in CGE&Y to Cap Gemini; and (4) Cap Gemini is not "a legal or beneficial owner" of the shares, even if the shares are "held [for the ACPs] in custodial accounts and/or Trusts" (Defs.' Ex. 1A, Master Transaction Agreement at 000046-47, 000121-24, 000143).

---

[5]That regulation requires a partner who sells her interest in a partnership that has any unrealized receivables or inventory items to "submit with [her] income tax return for the taxable year in which the sale . . . occurs a statement setting forth . . . the date of the sale. . . [,] the amount of any gain or loss attributable to the [receivables or inventory,] and . . . the amount of any gain or loss attributable to capital gain or loss on the sale of the partnership interest." 26 C.F.R. § 1.751-1(a)(3).

But, by signing the CPTA, the Cynthia also agreed to a number of restrictions on her use of the shares, including that she: (1) could not "directly or indirectly, sell, assign, transfer, pledge, grant any option with respect to or otherwise dispose of any interest in" their Cap Gemini Shares, except in periodic offerings organized by Cap Gemini, for a period of four years and 300 days after the closing; (2) gave Cap Gemini with exclusive authority to invest, transfer and release the assets in her restricted account during the four-year-300-day period after closing; and (3) would forfeit some or all of the Cap Gemini shares allotted to her if she breached certain provisions of her employment agreements with Cap Gemini, voluntarily ended her employment with Cap Gemini, or was terminated by Cap Gemini "for cause" or "poor performance." (Defs.' Ex. 1B, CPTA at 000597-98, 000627-31, 000641.)

Taken together, and viewed in light of the legal principles for determining when income is received, it is not clear whether the parties intended that the ACPs would receive 100 percent of the stock as income on the date of the closing or intended them to receive as income for that year only the portion of the stock that was liquidated at closing. Because the transaction documents are susceptible to more than one reasonable interpretation, the Court finds that they are ambiguous.

That ambiguity is resolved, however, by the undisputed extrinsic evidence in the record, *see Henrich v. Phazar Antenna Corp.*, 827 N.Y.S.2d 58, 60 (N.Y. App. Div. 2006) ("Extrinsic or parol evidence of the parties' intent may be considered . . . if the agreement is ambiguous."), all of which shows that the parties intended the ACPs to receive all of the stock as income in 2000. The PID, which Cynthia reviewed before she signed the CPTA (*see* Defs.' Ex. 1B, CPTA at 000619, 000622, 000624), says:

> The sale of Consulting Services to Cap Gemini is a taxable capital gains transaction with a minimal amount of ordinary income. Even though both the firm

and the partners are sellers in this transaction, the partners are treated as though they receive all of the gain and are taxed on it. . . .

You are responsible for paying your own taxes out of the proceeds allocated to you; however, you will receive funds from the sale of Cap Gemini shares for your tax obligations as they come due. As long as you meet the "safe harbor" estimated tax payment rules in calendar year 2000, you will not need to pay federal tax on your share of the gain until April 2001. . . .

. . .

The fair market value of the stock received that cannot be sold immediately will be calculated at 95 percent of the closing price of Cap Gemini stock on the day of the exchange for [CGE&Y] shares. This discount will slightly reduce tax due on the Cap Gemini shares received at closing. It has also been agreed that Ernst & Young, its partners, and Cap Gemini will treat valuation and related issues consistently for US federal income tax purposes.

. . .

The gain on the sale of the distributed [CGE&Y] shares is reportable on Schedule D of your U.S. federal income tax return for 2000.

(Defs.' Ex. 1D, PID at 000726-27 (footnote and emphasis omitted).) Moreover, Arthur Gordon, a

former Ernst & Young partner who was among those who explained the transaction to Cynthia and

the other ACPs at the March 2000 meeting (*see* Cole Decl., Ex. 33, Gordon Dep. at 17-18, 46-49),

testified as follows:

Q.    Was there any discussion at [the March 2000] meeting about the implications of having all of the shares vest at closing . . . ?

. . . .

A.    Yes. The question was asked why do we want to have this as a taxable transaction on day one. And the answer provided was that . . . . [w]e wanted to have the ability to get capital gains into [sic] future on having these shares with a price that they already paid because you sell 25 percent and paid the taxes on the whole amount, so that set your share price or any other gain above it would have been, again, a capital gain as long as you held it for more than one year. And people were extraordinarily optimistic that the stock was

11

going to continue to rise at some exponential rate and there was a lot of focus on making sure that they got capital gain on this transaction.

. . .

Q.    [W]ould it have been possible to do this kind of transaction with a structured vesting, in other words, vesting over a period of time? . . .

. . .

A.    It was not possible to do this as an installment sale and we thought there was too much risk in creeping vesting.

. . .

Q.    Can you describe the reasons why [creeping vesting] was not the favored outcome of the transaction? . . .

A.    [F]irst, it didn't qualify as an installment sale. And secondly, if it wasn't going to be an installment sale, the thought was this would look like a compensation issue and we didn't want this to be a compensation issue. Because we all wanted to own the shares outright and all wanted to get the capital gain and, therefore, have this transaction closed.

Q.    Are you saying that by not vesting everyone immediately that it would be questioned as to whether that was simply deferred compensation as opposed to a sale of assets?

A.    Yes, sir.

(*Id.* at 144-45, 149-51.)

The parties' actions after the closing also reflect their understanding that the ACPs realized income from all of the stock when the deal closed. It is undisputed that Cap Gemini sent Cynthia a Form 1099-B indicating that she received $2,478,655.00 in gross proceeds from the May 23, 2000 sale of her interest in CGE&Y. (*Id.*, Ex. 12, Form 1099-B at 001204; *see id.* Letter of 2/26/01 from Gordon to ACPs at 001203 ("The [enclosed] form 1099-B reflects the amount of consideration you are deemed to have received . . . .").) It is also undisputed that defendants reported those proceeds

12

as income on their original tax return for 2000. (*Id.*, Ex. 19, Defs.' 2000 Form 1040 & Schedule D.) Moreover, Cynthia says they did so to avoid "being in breach of contract" (Defs.' Ex. 1, Cynthia Aff. ¶ 27), a tacit admission that the parties intended the ACPs to report all of the Cap Gemini stock as income in 2000. Given this undisputed evidence, the Court finds that the parties intended that the ACPs would receive all of their Cap Gemini stock as income in 2000.

Nonetheless, defendants say the Court cannot enforce that provision because it violates public policy as embodied in the Tax Code and regulations concerning receipt and reporting of income. *See* 26 U.S.C. § 451 (requiring taxpayers to report income in year it is received); 26 C.F.R. § 1.451-2 (stating that a taxpayer receives income when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time," but not if it "is subject to substantial limitations or restrictions"). Even if that is true, which the Court does not decide, respect for the Tax Code is not the only public policy interest implicated by this case. Other compelling policy interests include the parties' interest in "the utmost freedom of contract" and being able to predict reliably the tax consequences of their business decisions, the law's distaste for unilateral contract reformation that benefits one party at the expense of the other, and the government's interest in avoiding conflicting tax claims and maximizing the efficiency of revenue collection. *See Hosp. Corp. of Am. v. Comm'r Internal Revenue*, Nos. 10663-91, 13074-91, 28588-91, 6351-92, 1996 WL 740741, at \*14 (T.C. Dec. 30, 1996); *Martin v. Martin*, 172 N.Y.S.2d 636, 638 (N.Y. App. Div. 1958).

In determining whether to enforce a contract term said to violate a public policy, the Restatement of Contracts instructs courts to consider: (1) the parties' expectations; (2) whether forfeiture will result if enforcement is denied; (3) any special public interest in enforcement of the

term; (4) the strength of the policy contravened by the term and whether a refusal to enforce it will further that policy; and (5) the seriousness and deliberateness of any misconduct involved and the strength of the connection between that misconduct and the disputed term. Restatement (Second) of Contracts § 178. A number of courts have weighed these factors, either implicitly or explicitly, in determining whether to enforce contract provisions specifying the tax consequences of a business transaction, with varying results.

One of the leading cases, and that on which the government most heavily relies, is *Commissioner of Internal Revenue v. Danielson*, 378 F.2d 771 (3rd Cir. 1967). In that case, the government challenged the Tax Court's refusal to require the parties to a stock sale agreement, in which they had allocated $152.00 per share for a covenant not to compete and $222.00 per share for the stock itself, to abide by the tax consequences of that allocation. *Id.* at 772-74. The government contended that the parties to the contract should not be permitted to attack the allocation provision to which they agreed "except in cases of fraud, duress or undue influence." *Id.* at 774. The taxpayers argued that such an approach would elevate form over substance, as the amount allocated for the covenant had no "relationship with business reality." *Id.*

The Third Circuit agreed with the government:

> . . . [T]o permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an attack would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. . . .

> Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated to the

14

covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. . . .

Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. . . . He would be confronted with . . . litigation against both buyer and seller in order to collect taxes properly due. . . .

*Id.* at 775; *see Schatten v. United States,* 746 F.2d 319, 321-322 (6th Cir. 1984) (per curiam) (applying the rationale of *Danielson* to defeat a taxpayer's claim that the characterization of payments as alimony in a divorce settlement should be disregarded); *Bradley v. United States,* 730 F.2d 718, 719-20 (11th Cir. 1984) (applying the reasoning of *Danielson* to reject a taxpayer's claim that money from a real property purchase was payment on an option rather than interest income as stated by the contract).

Not all courts have adopted the Third Circuit's reasoning. Others have resolved the competing policy considerations by holding that "the allocation in the agreement presumptively controls the tax consequences of the purchase" unless the parties overcome that presumption with "'strong proof' that . . . it was the[ir] intention . . . to allocate a different amount to the covenant not to compete." *Leslie S. Ray Ins. Agency, Inc. v. United States,* 463 F.2d 210, 212 (1st Cir. 1972); *see Ullman v. Comm'r Internal Revenue,* 264 F.2d 305, 308 (2d Cir. 1959) ("[W]hen the parties to a transaction such as this one have specifically set out the covenants [not to compete] in the contract and have . . . given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.").

The Seventh Circuit has not explicitly endorsed either the rationale of *Danielson* or the "strong proof" test, though it has addressed two cases with similar issues. The first such case is *Comdisco, Inc. v. United States,* in which a taxpayer sued the government for a refund it claimed to be owed as a result of certain investment tax credits. 756 F.2d 569, 571 (7th Cir. 1985). The credits

15

Comdisco claimed were only available to taxpayers who were original users or lessees of, among other things, office equipment. *Id.* at 571-72. The transactions pursuant to which Comdisco claimed the credit as a lessee were generally as follows: (1) Company A leased office equipment to Company B for a certain term and at a certain price, and then assigned its rights in the lease to Comdisco; (2) the same day, Company A leased the same equipment to Comdisco on similar terms, transferred the investment tax credit to Comdisco, and authorized it to sublease the equipment to Company B; (3) Comdisco did not enter into a sublease with Company B, and Company B received the equipment from, and made its rental payments to, Company A. *Id.* at 573-74. The district court concluded that Comdisco was an assignee of the lease between Companies A and B, not a bona fide lessee, and thus, was not entitled to the investment tax credit. *Id.* at 575.

On appeal, the government argued, among other things, that the Seventh Circuit should follow *Danielson* and hold the parties to the form of transaction that they adopted, which was an assignment. *Id.* at 577. The court disagreed:

> ... [T]he Government is correct when it notes that, in a wide variety of tax litigation, while the Commissioner may attack the nominal form of a transaction in order to enforce the tax laws, a taxpayer generally may not disavow the form of a deal.
>
> ... Often called the *Danielson* rule ..., [it] has ... been applied in cases where two parties to a deal have both sought to acquire beneficial tax treatment... . If the second party later disavows the form of the deal, the Government would be faced with the prospect of having to proceed against both taxpayers to resolve who should receive the advantageous treatment. ...
>
> In contrast to the conflicting claims cases, the Government will never be faced with conflicting claims to the investment tax credit because of the requirement that the investment tax credit can only be transferred pursuant to an express assignment of the credit. We see no reason to extend the Government's power to hold a taxpayer to the technical form of its transactions to situations in which the Government will never face conflicting claims. Therefore, in this case, we abandon

the approach that binds a taxpayer to the labels given to a transaction in favor of an analysis that looks at the economic substance of the transaction.

*Id.* at 577-78 (citations omitted).

Shortly thereafter, the Seventh Circuit decided *Kreider v. Commissioner of Internal Revenue*, 762 F.2d 580 (7th Cir. 1985). In that case, the taxpayers appealed the Tax Court's ruling that a payment they received in connection with the sale of their trucking company was consideration for a covenant not to compete and compensation for personal services, as the contract said, not additional payment for stock, as the taxpayers argued. *Id.* at 581. The Tax Court held that the taxpayers were bound by the form of their agreement absent strong proof that the agreed-upon allocation was not what the parties intended. *Id.* at 585-86. On appeal, the taxpayers urged the Seventh Circuit to reject the strong proof test and decide the case, as it had in *Comdisco*, based on the substance of the parties' agreement rather than its form. *Id.* at 586.

Without discussing *Comdisco* or *Danielson*, the Seventh Circuit endorsed the strong proof test:

> . . . *Wilson Athletic Goods* does not support Kreider's contention that this circuit has rejected the strong proof standard. Our emphasis in [that case] on the intent of the parties and economic realities is not at all inconsistent with approval of the strong proof standard, since the strong proof standard focuses on the same factors. We therefore hold that the Tax Court did not err in using the strong proof standard in this case under the assumption that it would be acceptable to this circuit.

*Id.* at 586-87 (citations omitted). Moreover, the court said, applying that test to the facts of the case yielded a victory for the government:

> Under the strong proof standard, Kreider must present strong proof that the $631,383.80 payment under paragraph 8 was intended by the parties to be additional consideration for their stock rather than what paragraph 8 says it is. . . . [The taxpayers] presented no evidence that the parties intended to allocate to the stock price more than the amount stated in the contract, and presented no persuasive evidence that the $1.2 million sale price was inadequate or that allocating the

17

additional payment to compensation for services or to the covenant not to compete would not comport with economic reality. The Tax Court's decision is supported by both parties' treatment of the additional payment on their 1977 tax returns as attributable to the covenant not to compete rather than to the sale price of the stock.

*Id.* at 587.

Given the Seventh Circuit's *Danielson*-like dictum in *Comdisco, see* 756 F.2d at 577 ("[A] taxpayer generally may not disavow the form of a deal"), and apparent endorsement of the strong proof test in *Kreider, see* 762 F.2d at 587 ("[T]he Tax Court did not err in using the strong proof standard in this case under the assumption that it would be acceptable to this circuit."), it is not clear which standard the Seventh Circuit would apply to this case. Ultimately, however, it does not matter because the government would prevail under either approach.

Defendants say they satisfy the *Danielson* test because they have evidence that suggests Cynthia's agreement to the income receipt provision was the product of undue influence. *See* 378 F.2d at 775 (stating that parties can escape the tax consequences of a contract provision only if the provision is "unenforceab[le] because of mistake, undue influence, fraud, [or] duress"). "Undue influence is the product of persistent and subtle suggestion imposed upon a weaker mind and calculated, by the exploitation of a relationship of trust and confidence, to overwhelm the victim's will to the point where [she] becomes the willing tool to be manipulated for the benefit of another." *In re Mildred M.J.*, 844 N.Y.S.2d 539, 541 (N.Y. App. Div. 2007) (quotation omitted). The undue influence concept "protects a person only if he is under the domination of another or is justified, by virtue of his relation with another[,] in assuming that the other will not act inconsistently with his welfare." Restatement (Second) of Contracts § 177 cmt. a. Such relationships include those of "parent and child, husband and wife, clergyman and parishioner, and physician and patient." *Id.* With respect to undue influence, "[t]he ultimate question is whether the result was produced by

18

means that seriously impaired the free and competent exercise of judgment" and depends on factors like "the unfairness of the resulting bargain, the unavailability of independent advice, and the susceptibility of the person persuaded." *Id.* cmt. b.

It is not clear whether the concept of undue influence applies to documents other than wills. *See Nice v. Combustion Eng'g, Inc.*, 599 N.Y.S.2d 205, 206 (N.Y. App. Div. 1993) ("'Duress' is a defense to a breach of contract action and 'undue influence' is a ground for invalidating a will."). To the extent it does, however, the undisputed facts establish that it would not apply here. There is no dispute that, at the time of the transaction, Cynthia was a partner of Ernst & Young (*see* Defs.' Ex. 1, Cynthia Aff. ¶ 2), not an unsophisticated schoolgirl. Moreover, as Cynthia admits, she had seven days to review the documents for, and seek legal or tax advice on, the proposed transaction before she had to vote on it. (*Id.* ¶ 15.) Moreover, there is no dispute that Cynthia received 16,500 shares of Cap Gemini, worth nearly $2.5 million, as a result of the transaction. (*See* Cole Decl., Ex. 12, Form 1099-B at 001204.) Given these undisputed facts, the doctrine of undue influence would not apply to this case, even if applied outside the realm of wills.

Alternatively, Cynthia says the contested provision is unenforceable because she agreed to it under duress. "Economic duress exists when a party is forced to agree to a contract by means of a wrongful threat which precludes the exercise of its free will." *Finserv Computer Corp. v. Bibliographic Retrieval Servs., Inc.*, 509 N.Y.S.2d 187, 189 (N.Y. App. Div. 1986). A threat is wrongful if, among other reasons, the act threatened would breach the duty of good faith and fair dealing inherent in every contract. Restatement (Second) of Contracts § 176(1)(d). Defendants say that is exactly what happened here, because Ernst & Young threatened to fire Cynthia if she did not vote in favor of the Cap Gemini deal.

There are two ways of interpreting this argument: (1) Cynthia feared that, if the deal was not approved, she would be fired for having voted against it; or (2) she feared that, if the deal was approved over her objection and she did not go to work for Cap Gemini, Ernst & Young would refuse to retain her. Defendants have no evidence to support either version.

With respect to the first, Cynthia does not assert that someone told her she would be fired if she voted against the deal or that she inferred as much from something she heard or read. Nor does she offer third-party testimony or any other evidence that lends credence to her unsubstantiated belief. The record is equally barren of support for the second interpretation. In fact, the only evidence about the post-deal fate of consulting partners who did not join Cap Gemini is the testimony of Arthur Gordon, who said:

> Ernst & Young was forbidden to be in the, quote, consulting service business. But some of the consulting service partners had skills that fit into what was not defined as the consulting service business and basically helped the audit practice or the tax practice or something of that nature. And, if there was a place for them, they would continue to be at Ernst & Young.

(See Cole Decl. Ex. 33, Gordon Dep. at 157.) In short, there is no evidence to suggest that Ernst & Young threatened to fire Cynthia if she did not vote in favor of the Cap Gemini deal. Thus, she has not raised a triable issue of fact as to whether she acted under duress.

Having failed to raise a genuine issue of material fact as to whether Cynthia's agreement to the contested contract provision was unenforceable because of undue influence or duress, she cannot take refuge in *Danielson*. *See* 378 F.2d at 775.

Defendants fare no better with the strong proof test, which requires them to overcome the presumption that the tax consequences of the deal are as stated in the contract with strong proof that the parties intended them to be otherwise. *See Leslie S. Ray*, 463 F.2d 212. The record contains no

proof, let alone strong proof, that the parties intended the ACPs to receive income from the Cap Gemini stock over time. In fact, as discussed above, the undisputed facts, including Cynthia's own testimony, establish that the parties intended the ACPs to receive all of the stock as income at the time of the closing. (*See supra* at 10-13; Defs.' Ex. 1, Cynthia Aff. ¶ 27; Defs.' Ex. 1A, Master Transaction Agreement at 000046-47, 000121-24, 000143; Defs.' Ex. 1B, CPTA at 000620, 000626; Defs.' Ex. 1D, PID at 000726-27; Cole Decl., Ex. 33, Gordon Dep. at 17-18, 46-49, 144-45, 149-51; *id.*, Ex. 12, Form 1099-B at 001204; *id.*, Ex. 19, Defs.' 2000 Form 1040, Schedule D.) Given the undisputed evidence in the record, defendants cannot avail themselves of the strong proof test.

The result is no different if the Court eschews *Danielson* and the strong proof test in favor of the balancing approach set forth in the Restatement. Assuming, *arguendo*, that the parties' agreement to report the Cap Gemini stock as income received by the ACPs in 2000 violates federal tax law, that term would still be enforceable under the circumstances of this case. As discussed above, the undisputed facts show that the parties intended the stock to be treated as income to the ACPs in 2000 and reported the transaction to the IRS in that manner. Invalidating that provision would: amount to a unilateral reformation of the contract in defendants' favor; deprive Cap Gemini of the tax consequences that it anticipated and for which it bargained; force the government to engage in litigation to collect the taxes due on the transaction; and expose the government to the risk of inconsistent adjudications and, thus, a loss of tax revenues. Given those undisputed facts and compelling policy considerations, the Restatement would also not permit Cynthia to go back on her agreement.

21

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment is denied [doc. no. 27] and the government's motion [ doc. no. 31] is granted. The parties have fourteen days from the date of this Order to submit an agreed calculation as to the amount of the judgment or, if they cannot agree, separate calculations as to the appropriate amount with the necessary legal and factual support.

**SO ORDERED.**                         **ENTERED:** 1/15/08

**HON. RONALD A. GUZMAN**
**United States District Judge**

22